**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JUSTIN KORN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SIMPLILEARN AMERICAS INC.,<br><br>Defendant. | Case No. 1:25-cv-10461<br><br>**JURY TRIAL DEMANDED**<br><br>LEAVE TO FILE GRANTED MAY 5, 2025 |

**FIRST AMENDED CLASS ACTION COMPLAINT**

Dated: May 5, 2025

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (BBO #716245)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7127
Facsimile: (212) 989-9163
Email: ykopel@bursor.com

*Attorney for Plaintiff*

**TABLE OF CONTENTS**

PAGE

NATURE OF THE ACTION .....1

THE PARTIES .....2

JURISDICTION AND VENUE .....2

FACTUAL ALLEGATIONS .....3

I. HISTORY AND OVERVIEW OF THE VPPA ..... 3

II. DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER ..... 4

III. DEFENDANT KNOWINGLY DISCLOSES CONSUMERS' PII TO THIRD PARTIES ..... 5

A. Testing Reveals That Defendant Illegally Shares Consumers' PII With Amplitude And WebEngage ..... 5

1. Overview Of The Amplitude API ..... 11

2. Overview of the WebEngage API ..... 11

B. Defendant Discloses iOS Users' PII To Amplitude And WebEngage ..... 12

1. Defendant Discloses iOS App Users' Geolocation and Email Addresses to Amplitude and WebEngage ..... 12

2. Defendant Discloses Information Identifying What Specific Videos Were Requested or Obtained By Which Specific iOS App Users to Amplitude and WebEngage ..... 15

C. Defendant Discloses Android App Users' PII To Amplitude And Web Engage ..... 17

1. Defendant Discloses Android App Users' Email Addresses to Amplitude and WebEngage ..... 17

2. Defendant Discloses Android Users' AAIDs to Amplitude ..... 17

3. Defendant Discloses Information Identifying What Specific Videos Were Requested, or Obtained By What Specific App Users to Amplitude and WebEngage ..... 19

IV. DEFENDANT DISCLOSES PERSONALLY IDENTIFIABLE INFORMATION TO THIRD PARTIES FOR THE PURPOSE OF MARKETING, ADVERTISING. AND ANALYTICS ........ 20

A. Defendant Discloses Personally Identifiable Information To Amplitude For The Purpose Of Marketing, Advertising, And Analytics ........ 21

B. Defendant Discloses Personally Identifiable Information to WebEngage for the Purpose of Marketing, Advertising, and Analytics ........ 22

V. PLAINTIFF'S EXPERIENCE ........ 29

CLASS ALLEGATIONS ........ 30

CAUSES OF ACTION ........ 32

JURY TRIAL DEMANDED ........ 34

Plaintiff Justin Korn ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Simplilearn Americas Inc. ("Simplilearn" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action suit brought against Defendant for violating the Video Privacy Protection Act ("VPPA").

2. The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8 (1988). "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

3. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710.

4. Defendant owns and operates Simplilearn, an "online learning app that can help you achieve your career goals" (the "App").[1]

5. Unbeknownst to Plaintiff and Class Members, Defendant knowingly and intentionally disclosed its users' personally identifiable information ("PII")—including a record

[1] *Simplilearn: Online Learning*, Google Play, https://play.google.com/store/apps/details?id=com.mobile.simplilearn (last accessed Dec. 2, 2024).

of every video viewed, requested and obtained—to unrelated third parties. By doing so, Defendant violated the VPPA.

6. Plaintiff brings this action for damages and other legal and equitable remedies resulting from Defendant's violations of the VPPA.

## THE PARTIES

7. Plaintiff Justin Korn is a natural person and citizen of Massachusetts, residing in Acton, Massachusetts. Plaintiff Korn was in Massachusetts when he used the App and requested, obtained and watched videos on the App.

8. Defendant Simplilearn Americas, Inc. is a Texas corporation with its principal place of business at 5851 Legacy Circle 6th Floor Plano, Texas 75024.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).

10. This Court has personal jurisdiction over Defendant because the App collected and disseminated the personally identifiable information giving rise to this lawsuit in this District and Defendant conducts substantial business in this District. Further, Defendant contracts with Massachusetts-based university UMass Amherst to provide the course content featured on the App.[2]

11. Defendant derives substantial revenue from showing advertising to its users in the Commonwealth of Massachusetts, and those advertisements are directly targeted at and tailored to Massachusetts users based on their location in Massachusetts. Through the collection of users'

[2] *UMass Amherst: Professional Certificate Program in Lean Six Sigma*, Simplilearn, https://www.simplilearn.com/pgp-lean-six-sigma-certification-training-course (last accessed Dec. 2, 2024).

data, described above, Defendant is able to hyper-target users with advertising most relevant to them.

12. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District, and Plaintiff Korn resides in this District.

## FACTUAL ALLEGATIONS

### I. HISTORY AND OVERVIEW OF THE VPPA

13. The impetus for the VPPA began with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper, which then published that record. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Robert Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. No. 100-599, at 5-6 (1988) (internal ellipses and brackets omitted.)

14. In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. No. 112-258, at 2 (2012).

15. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider[]." 18

U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials[]." 18 U.S.C. § 2710(a)(4).

## II. DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER

16. The App is available for download on both iOS and Android and is available for use throughout the United States, including Massachusetts.

17. In particular, the App provides hundreds of live and on-demand courses, all of which contain video lessons, covering various topics in IT and technology.

18. All App users, even those who do not pay to use the App, must create an account and go through the App's sign-up process to view on-demand videos.

19. The App's sign-up process requires users who are creating an account to provide their full name, email address, and contact phone number to Defendant.[3] Regardless of how a user chooses to create a Simplilearn account, they must at least provide their email address.[4] In addition, after account creation and when a user first attempts to watch videos for a Simplilearn course, Defendant requires users to provide their first name, last name, title, gender, date of birth, and time zone, with the additional option of providing the user's LinkedIn profile.[5]

---

[3] Sign up, Simplilearn, https://accounts.simplilearn.com/user/register-email (last accessed Apr. 29, 2025).

[4] Other sign up options include signing up with Google, LinkedIn, Facebook, and Apple logins. *See* Accounts, Simplilearn, https://accounts.simplilearn.com/user/register (last accessed Apr. 29, 2025).

[5] Account Dashboard, Simplilearn, https://lms.simplilearn.com/dashboard/oob/onboarding (last accessed Apr. 29, 2025).

20. To obtain a "certificate" in an on-demand course on the App, users must watch a certain percentage of the prerecorded videos associated with a particular course.

21. Each course is unique and contains a particular set of videos that are obtained when a user "enrolls" in that particular course.

## III. DEFENDANT KNOWINGLY DISCLOSES CONSUMERS' PII TO THIRD PARTIES

### A. Testing Reveals That Defendant Illegally Shares Consumers' PII With Amplitude And WebEngage

22. In October 2024, Plaintiff's counsel retained a private research company to review the App and conduct a dynamic analysis. A "dynamic analysis" records the transmissions that occur from a user's device while using the App.

23. The researchers tested what information (if any) was disclosed when a user enters information into or watches a video on the App. The analysis revealed that Defendant discloses information to third parties sufficient to identify specific Class Members and learn the specific videos they requested and obtained.

24. The analysis first established that Defendant incorporates multiple "application programming interfaces" ("APIs") into its App.

25. APIs enable application owners "to make their application data and functions available to departments within their organization. Application owners can also share or market data and functions to business partners or third parties."[6]

26. Defendant integrates into the App the Amplitude API, an API owned and operated by a company of the same name that operates as a digital analytics platform for businesses.[7]

---

[6] Michael Goodwin, *What is an API (application programming interface)?*, IBM (April 9, 2024), https://www.ibm.com/topics/api.

[7] *Analytics*, Amplitude (April 16, 2024), https://amplitude.com/docs/analytics.

27. Defendant also integrates into the App the WebEngage API, an API owned and operated by a company of the same name that operates as a digital analytics platform for businesses.[8]

28. The dynamic analysis found that when a user views a video on the App on either an Android or iOS mobile device, Defendant transmits information sufficient to permit an ordinary person to identify a specific person's video-viewing behavior to third parties Amplitude and WebEngage:

**Summary of Third-Party Exfiltration**

| THIRD PARTY | VIDEO INFO | PERSONAL INFO | OTHER INFO |
|---|---|---|---|
| **Amplitude** | Course Titles, Course IDs** | Email | Signup Info*, AAID |
| **WebEngage** | Course Titles, Course IDs, Video Titles, Video IDs** | Email | Signup Info*, AAID |

29. Specifically, when an iOS user signs up for an account and watches a course on the App, Defendant discloses to Amplitude through the Amplitude API a user's (i) email address, (ii) geolocation, (iii) viewed course title, (iv) viewed course ID, and (v) IDFV[9] (an app identifier across iOS devices that "allows publishers to measure user behavior across multiple apps within their own app ecosystem").

[8] *Preface*, WebEngage, https://knowledgebase.webengage.com/docs/preface?_gl=1*1b19uvf*_gcl_au*MTE4MDAzNDYuMTczMzE3MzAwNQ..*_ga*MTEyMzkzOTgxMi4xNzMzMTcyOTkw*_ga_3NGD3E18DP*MTczMzE3MzAwNS4xLjAuMTczMzE3MzAwOC41Ny4wLjA (last accessed Dec. 2, 2024).

[9] Glossary, Appsflyer, https://www.appsflyer.com/glossary/idfv/ (last accessed Apr. 29, 2025).

We observed **Amplitude** obtaining:

**Video Information** in the form of:

- Course Title
- Course ID

**Personal Information** in the form of:

- Email
- Geolocation

**Other Information** such as:

- IDFV
- User data entered in signup flow


```
(packet) outbound to api.amplitude.com:443 at time Thu 17 Oct 2024,
17:15:23.665270 (1729185323.66527) uuid 5ee207f9-cec7-4c6a-84f3-8e30bb8e7377
----------------------------------
POST / HTTP/2.0

{
"api_properties": {
"ios_idfv": "8334F6E8-574C-4B27-91CC-05A601DB0BEF",
"location": {
"lat": "42.07[redacted]
"lng": "-73.37[redacted]
}
},
"carrier": "--",
"country": "United States",
"device_id": "8334F6E8-574C-4B27-91CC-05A601DB0BEF",
"device_manufacturer": "Apple",
"device_model": "iPhone12,1",
"event_id": "22",
"event_properties": {
"access days left": "89",
"access type": "freemium",
"category id": "415",
"category name": "Data & Business analytics",
"course progress percentage": "0",
"elearning id": "4214",
"elearning name": "Python for Beginners",
"product id": "1723",
"screen type": "self learning",
"sl_freemium_user": "true",
"training type": "osl"
},
"event_type": "Viewed Course overview",
"group_properties": {
},

...
"groups": {
},
"language": "English",
"library": {
"name": "amplitude-ios",
"version": "4.10.0"
},
"os_name": "ios",
"os_version": "17.6.1",
"platform": "iOS",
"sequence_number": "28",
"session_id": "1729185293431",
"timestamp": "1729185579708",
"user_id": [redacted]@gmail.com",
"user_properties": {
},
"uuid": "A65D5EA0-3970-410E-A3E7-5839A58CBC76",
"version_name": "9.15.52"
}

{
"api_properties": {
"ios_idfv": "8334F6E8-574C-4B27-91CC-05A601DB0BEF",
"location": {
"lat": "42.07[redacted]
"lng": "-73.37[redacted]
}
},
"carrier": "--",
"country": "United States",
"device_id": "8334F6E8-574C-4B27-91CC-05A601DB0BEF",
[...]
"event_properties": {
"answer id": [
"switch_job_domain"
],
"answer name": [
"Switching my domain"
],
"question id": "Goal1",
"question type": "goal"
},
"event_type": "Course Personalization Answer Selected",
"group_properties": {
},
[...]
"user_properties": {
},
"uuid": "8A51786A-4C83-442C-B9CC-2621E077E4B2",
"version_name": "9.15.52"
},
```

30. Further, when an Android user signs up for an account and watches a course on the App, Defendant discloses to Amplitude through the Amplitude API a user's (i) email address, (ii) course title, (iii) course ID, and (iv) AAID.

We observed **Amplitude** obtaining:

**Video Information** in the form of:

- Course Title
- Course ID

**Personal Information** in the form of:

- Email

**Other Information** such as:

- User data entered in signup flow
- AAID


```
(packet) com.mobile.simplilearn outbound to
api2.amplitude.com:443 (35.85.75.130) at time Thu 17 Oct 2024,
17:40:15.484449 (1729186815484449) uuid
a4f6c6fe-4ba4-4d83-9481-bd549edf2047_7
------------------------------
POST / HTTP/2
host: api2.amplitude.com
content-type: application/x-www-form-urlencoded
content-length: 37064
accept-encoding: gzip
user-agent: okhttp/4.9.0
[...]
{
[...]
"device_id": "f21aaa2b-a3fe-45f1-bf21-fa55fc40fe13R",
"event_properties": {
        "freemium available": "true",
        "product id": "3810",
        "product name": "Introduction to Image Generation",
        "product type": "course",
        "sl_freemium_user": "true",
        "source page": "home",
        "widget title": "Grow with Google GenAI Courses"
},
"event_type": "Open Course",
"user_id": [redacted]@gmail.com",
"uuid": "9449655c-cd7b-499d-bca8-c192402d3892",
"version_name": "11.8.15"
}
[...]
POST / HTTP/2
host: api2.amplitude.com
content-type: application/x-www-form-urlencoded
content-length: 37064
accept-encoding: gzip
user-agent: okhttp/4.9.0
[...]

{
[...]
"api_properties": {
"androidADID": "fe0edf21-142b-4263-ba0f-ed7283d8199b",
"gps_enabled": "true",
"limit_ad_tracking": "false"
},
"user_properties": {
        "$set": {
        "skillup_goal": [ "Switching my domain" ]
        }
},
"uuid": "cea9b304-359b-4cd5-b2b7-72a80f3d9c4c",
"version_name": "11.8.15"
},
[...]
```

31. In addition, when an iOS user signs up for an account and watches a course on the App, Defendant discloses to WebEngage through the WebEngage API a user's (i) email address, (ii) geolocation, (iii) course title, (iv) course ID, (v) IDFV, and (vi) zip code.

We observed **WebEngage** obtaining:

**Video Information** in the form of:

- Course Title
- Course ID

**Personal Information** in the form of:

- Geolocation
- Zip Code

**Other Information** such as:

- IDFV
- User data entered in signup flow


(packet) outbound to c.webengage.com:443 at time Thu 17 Oct 2024, 17:14:53.776115
(1729185293.776115) uuid a526eb78-7813-432d-9009-b6cac59a9492
--------------------------------
POST /m2.jpg HTTP/2.0

{
"category": "system",
"cuid": "",
"event_data": {
},
"event_name": "user_update_geo_info",
"event_time": "~t2024-10-17T17:14:57.924Z",
"interface_id": "com.simplilearn.Simplilearn|8334F6E8-574C-4B27-91CC-05A601DB0BEF",
"license_code": "311c5642",
"luid": "8DA3C55D-B3E5-402E-9AEB-FF5C43024059",
"suid": "84D01E6A-CF55-4132-999A-59B6DE23C4A9",
"system_data": {
"app_id": "com.simplilearn.Simplilearn",
"city": "Sheffield",
"country": "United States",
"latitude": "42.07[redacted]
"locality": "",
"longitude": "-73.37[redacted]
"postal_code": "01257",
"region": "MA",
"sdk_id": "3",
"sdk_version": "60600"
}

{
"category": "application",
"cuid": "",
"event_data": {
"answer id": [
"25",
"18"
],
"answer name": [
"Software Development",
"Digital Marketing"
],
"question id": "Category",
"question type": "category"
},
"event_name": "Course Personalization Completed",
"event_time": "~t2024-10-17T17:16:37.631Z",
"interface_id": "com.simplilearn.Simplilearn|8334F6E8-574C-4B27-91CC-05A601DB0BEF",
[...]
}
},
{
"category": "system",
"cuid": "",
"event_data": {
"user_selected_course_categories": [
"Software Development",
"Digital Marketing"
]
}
{
"category": "application",
"cuid": "",
"event_data": {
"freemium available": "true",
"product id": "1723",
"product name": "Python for Beginners",
"product type": "course",
"sl_app_user_is_guest": "true",
"sl_lms_user_osl_courses_count": "0",
"source page": "home",
"widget id": "127",
"widget title": "Recommended Courses"
},
"event_name": "Open Course",
"event_time": "~t2024-10-17T17:16:56.867Z",
[...]
"manufacturer": "Apple",
"model": "iPhone",
"os_name": "iOS",
"os_version": "17.6.1",
"page_view_count_session": "3",
"release": "17.6.1",
"screen_name": "sl_app_home",
"screen_title": "sl_app_home",
"sdk_id": "3",
"sdk_version": "60600",
"session_count": "1",
[...]
"total_page_view_count": "3",
"viewport_height": "1792",
"viewport_width": "828"
}

32. Moreover, when an Android user signs up for an account and watches a course on the App, Defendant discloses to WebEngage through the WebEngage API a user's (i) email address, (ii) course title, (iii) course ID, (iv) video title, and (v) video ID.

We observed **WebEngage** obtaining:

**Video Information** in the form of:

- Course Title
- Course ID
- Video Title
- Video ID

**Personal Information** in the form of:

- Email

**Other Information** such as:

- User data entered in signup flow


```
(packet) com.mobile.simplilearn outbound to c.webengage.com:443
(3.227.25.221) at time Thu 17 Oct 2024, 17:43:32.922628
(1729187012922628) uuid cb5ecfab-bb13-4b50-965b-6dc05f73ae13
--------------------------------
POST /m2.jpg HTTP/1.1
Authorization: Bearer
cuid: [redacted]@gmail.com
lc: 311c5642
[...]
{
"category": "application",
"cuid": [redacted]@gmail.com",
"event_data": {
"category id": "108",
"category name": "Generative AI",
"content partner name": "Google",
"elearning id": "6753",
"freemium available": "true",
"personalized course": "",
"product id": "3810",
"product name": "Introduction to Image Generation",
"product type": "course",
"sl_freemium_user": "true"
},
"event_name": "Start Course Enrollment",
[...]
}
POST /m2.jpg HTTP/1.1
lc: 311c5642
[...]
{
"category": "system",
"cuid": "",
"event_data": {
        "skillup_goal": [
        "Switching my domain"
        ]
},
"event_name": "user_update",
"event_time": "~t2024-10-17T17:38:29.352Z",
"interface_id":
"com.mobile.simplilearn|C6252DEEAAF8999547496998F80670F6",
"license_code": "311c5642",
"luid": "00000192-9b8f-0ecf-a070-a7a87d0ea4e3",
"suid": "00000192-9b8f-0f82-89e1-4f432cc070d8",
[...]
}
[...]
POST /m2.jpg HTTP/1.1
Authorization: Bearer
cuid: [redacted]@gmail.com
lc: 311c5642
Content-Type: application/transit+json
Accept-Encoding: gzip
User-Agent: Dalvik/2.1.0 (Linux; U; Android 14; Pixel 6 Build/UP1A.231105.003.A1)
Host: c.webengage.com
[...]

[...]
{
"category": "application",
"cuid": [redacted]@gmail.com",
"event_data": {
        "category name": "Data & Business analytics",
        "course progress percentage": "0",
        "elearning id": "4214",
        "lesson id": "67506",
        "lesson name": "Conditional Statements in Python",
        "lesson number": "Lesson 5",
        "product id": "1723",
        "product name": "Python for Beginners",
        "product type": "course",
        "topic id": "676419",
        "topic name": "5.1 Conditional Statements in Python",
        "video progress percentage": "0"
        [...]
},
"event_name": "Viewed Lesson Video",
[...]
```

*1. Overview Of The Amplitude API*

33. As Amplitude notes on its website, Amplitude is "a digital analytics platform" that purports to "help every business optimize the business value of digital product innovation."[10]

34. Once integrated into a developer's mobile application, the Amplitude API allows an app developer to, among other features, analyze app data in real time, track unique users,[11] and generate reports on user activity to inform advertising campaigns.[12]

35. As alleged in greater detail below, Defendant utilizes every one of these features of the Amplitude API in its App and sends its consumers' PII and communications to Amplitude through the Amplitude API in order to assist with Defendant's marketing, advertising, and analytics efforts.

*2. Overview of the WebEngage API*

36. WebEngage is "[a] robust customer data platform, personalization engine, omnichannel campaign manager, and an analytics engine all baked into one seamless full-stack Retention OS."[13]

37. In plain English, once integrated into a developer's mobile application, the WebEngage API allows an app developer to, among other features, conduct real-time targeted

[10] Amplitude, https://amplitude.com/company (last accessed Dec. 2, 2024).

[11] *Track unique users*, Amplitude (June 11, 2024), https://amplitude.com/docs/data/sources/instrument-track-unique-users.

[12] *Understanding your users' activity*, Amplitude (Aug. 28, 2024), https://amplitude.com/docs/get-started/understand-user-activity.

[13] WebEngage, https://webengage.com/home-old/ (last accessed Dec. 2, 2024).

marketing,[14] analyze app data in real time,[15] send personalized advertisements and offers to mobile users,[16] and to even "[i]nfluence [o]ngoing user [b]ehaviour" "using real-time personal & behavioral customer data."[17]

38. As alleged in greater detail below, Defendant utilizes every one of these features of the WebEngage API, and sends App users' PII to WebEngage through the WebEngage API in order to assist with Defendant's marketing, advertising, and analytics efforts.

### B. Defendant Discloses iOS Users' PII To Amplitude And WebEngage

#### *1. Defendant Discloses iOS App Users' Geolocation and Email Addresses to Amplitude and WebEngage*

39. Geolocation is "the identification of the real-world geographic location of an object."[18] Geolocation identifies an object by "generating a set of geographic coordinates such a[s] latitude and longitude through GPS and using the coordinates to determine a meaningful location."[19]

40. Geolocation is precise when it provides street level accuracy. Defendant discloses such precise geolocation here to both Amplitude and WebEngage, as demonstrated in the excerpted screenshots below (redacted for privacy). Specifically, Defendant discloses to

[14] *Real-Time Segmentation*, WebEngage, https://webengage.com/customer-segmentation/ (last accessed Dec. 2, 2024).

[15] *Real-Time Analytics*, WebEngage, https://webengage.com/product-and-revenue-analytics/ (last accessed Dec. 2, 2024).

[16] *Create Mobile App Experiences*, WebEngage, https://webengage.com/app-personalization/ (last accessed Dec. 2, 2024); *see also Orchestrate Your Campaigns*, WebEngage, https://webengage.com/campaign-orchestration/ (last accessed Dec. 2, 2024).

[17] *Influence Ongoing user Behavior with Real-time Segmentation*, WebEngage, https://webengage.com/customer-segmentation/live/ (last accessed Dec. 2, 2024).

[18] *What Is Geolocation*?, Indicative, https://www.indicative.com/resource/geolocation/ (last accessed Dec. 2, 2024).

[19] *Id*.

Amplitude, via the Amplitude API, iOS users' geolocation with *fifteen decimal places* of accuracy. This is smaller than "the width of a strand of thread," in "the range of microscopy,"[20] and "far beyond the level of accuracy needed for most GPS navigation and mapping purposes."[21]


```
"api_properties": {
"ios_idfv": "8334F6E8-574C-4B27-91CC-05A601DB0BEF",
"location": {
"lat": "42.07[redacted]
"lng": "-73.37[redacted]
```


41. This same ultra-precise level of geolocation is also disclosed by Defendant to WebEngage via the WebEngage API for iOS users:


```
"city": "Sheffield",
"country": "United States",
"latitude": "42.07[redacted]
"locality": "",
"longitude": "-73.37[redacted]
"postal_code": "01257",
"region": "MA",
```


42. Precise geolocation can be used by anyone to uniquely identify a person. A study in 2013, for example, analyzed mobility data for 1.5 million people, finding that researchers needed only four randomly chosen spatio-temporal points (points that represent the time and location of a specific event, such as watching a video) to uniquely identify 95% of the people (approximately 1.425 million out of 1.5 million) in the dataset.[22]

43. As Paul Ohm, a law professor and privacy researcher at Georgetown University Law Center, explains it: "[r]eally precise, longitudinal geolocation information is absolutely

---

[20] PRECISION MATTERS: THE CRITICAL IMPORTANCE OF DECIMAL PLACES, https://blis.com/precision-matters-critical-importance-decimal-places-five-lowest-go/

[21] KNOWLEDGE BASE ARTICLES, SNOWFLAKE, https://community.snowflake.com/s/article/Geospatial-data-supports-14-digits-after-decimal-point-for-coordinate-values

[22] Yves-Alexandre de Montjaye, et al., *Unique in the Crowd: The privacy bounds of human mobility*, SCIENTIFIC REPORTS 2 (Feb. 4, 2013), https://www.nature.com/articles/srep01376.

impossible to anonymize."[23] In fact, out of all identifiers, "D.N.A. is probably the only thing that's harder to anonymize than precise geolocation information."[24]

44. By disclosing users' geolocation data to third parties, Defendant discloses information that an ordinary person could use to identify its users.

45. Defendant discloses this geolocation to enhance its marketing efforts, its advertising profits, and its app analytics.

46. Companies collect and disclose geolocation so they can maximize their advertising revenue.[25] As a *New York Times* article explained: "For brands, following someone's precise movement is key to understanding the 'customer's journey'—every step of the process from seeing an ad to buying a product."[26]

47. Marketers consider geolocation "the Holy Grail of advertising" because it creates "the complete picture that connects all of our interests and online activity with our real-world actions."[27]

48. Defendant discloses geolocation for this precise purpose: so Amplitude and WebEngage can help Defendant maximize marketing and advertising revenue and conduct App analytics.

49. Defendant also discloses iOS users' email addresses to Amplitude, as can be seen in the following excerpt of the dynamic analysis:

---

[23] Stuart A. Thompson & Charlie Warzel, *Twelve Million Phones, One Dataset, Zero Privacy* N.Y. TIMES (Dec. 19, 2019), https://www.nytimes.com/interactive/2019/12/19/opinion/location-tracking-cell-phone.html.

[24] *Id.*

[25] *See id*.

[26] *Id*.

[27] *Id.*

"user_id": [redacted]@gmail.com",

50. An email address is a unique string of characters that designates an electronic mailbox. As industry leaders,[28] trade groups,[29] and courts agree,[30] an ordinary person can use an email address to uniquely identify another individual. Indeed, there exist multiple services that enable anyone with internet access and a credit card to look up who owns a particular email address.[31]

*2. Defendant Discloses Information Identifying What Specific Videos Were Requested or Obtained By Which Specific iOS App Users to Amplitude and WebEngage*

51. Defendant discloses the course title and course IDs of each course requested and obtained by each iOS App user to Amplitude and WebEngage.

52. For example, the dynamic analysis was conducted while a course called "Python for Beginners" was viewed on the App. As demonstrated below, this is a course provided by Simplilearn and the title and ID for the course were disclosed to Amplitude. Notably, anyone with access to the following excerpted dynamic analysis can tell that the user viewed a video because the event type field is "Viewed Course overview":

---

[28] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020, 12:10 PM), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[29] Network Advertising Initiative, *2020 NAI Code Of Conduct*, at 19 (2019), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[30] *See, e.g.*, *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of 'information that identifies an individual.' They can 'prove' or 'establish the identity of' an individual.") (citing *Identify, Webster's New International Dictionary* 1236 (2d ed. 1961).

[31] *See, e.g.*, www.beenverified.com.

```
"category name": "Data & Business analytics",
"course progress percentage": "0",
"elearning id": "4214",
"elearning name": "Python for Beginners",
"product id": "1723",
"screen type": "self learning",
"sl_freemium_user": "true",
"training type": "osl"
},
"event_type": "Viewed Course overview",
```


53. The same information was transmitted to WebEngage. Specifically, Defendant sends to WebEngage the network traffic containing the event showing that the user actually opened and viewed the course, here the "event_name" field is populated with "Open Course":


```
"freemium available": "true",
"product id": "1723",
"product name": "Python for Beginners",
"product type": "course",
"sl_app_user_is_guest": "true",
"sl_lms_user_osl_courses_count": "0",
"source page": "home",
"widget id": "127",
"widget title": "Recommended Courses"
},
"event_name": "Open Course",
```


54. Thus, this network traffic is transmitted when, and only when, the user actually plays the course module.

55. Because each on-demand course on the App is a packet—is a formulated standalone offering that contains its own distinct video modules—each course contains exactly the same pre-recorded videos regardless of which user accesses the course. Thus, disclosure of the course title also discloses precisely what videos were requested and obtained by any given user.

56. Further, completion of a certificate in a particular course discloses what videos were viewed, as course certificates are provided upon course completion.[32]

[32] Simplilearn, Python for Beginners, https://www.simplilearn.com/learn-python-basics-free-course-skillup (last accessed Apr. 30, 2025).

## C. Defendant Discloses Android App Users' PII To Amplitude And Web Engage

### *1. Defendant Discloses Android App Users' Email Addresses to Amplitude and WebEngage*

57. Defendant also discloses Android users' email addresses to Amplitude and WebEngage. The following excerpt of the dynamic analysis shows Defendant disclosing an Android user's email address to Amplitude:


```
"user_id": [redacted]@gmail.com",
"uuid": "9449655c-cd7b-499d-bca8-c192402d3892",
"version_name": "11.8.15"
```


58. And to WebEngage:

```
(packet) com.mobile.simplilearn outbound to  c.webengage.com:443
(3.227.25.221) at time Thu 17 Oct 2024, 17:43:32.922628
(1729187012922628) uuid cb5ecfab-bb13-4b50-965b-6dc05f73ae13
--------------------------------
POST /m2.jpg HTTP/1.1
Authorization: Bearer
cuid: [redacted]@gmail.com
```

59. As described above, an email address is a viable means to identify an individual.

### *2. Defendant Discloses Android Users' AAIDs to Amplitude*

60. In addition, Defendant discloses Android users' AAIDs to Amplitude. The following excerpted dynamic analysis captures Defendant disclosing an Android user's AAID to Amplitude:


```
"androidADID": "fe0edf21-142b-4263-ba0f-ed7283d8199b",
```


61. An Android Advertising ID, or AAID, is a unique string of numbers that attaches to a device. As the name implies, an AAID is sent to advertisers and other third parties so they can track user activity across multiple mobile applications.[33] So, for example, if a third party

---

[33] *See* Advertising ID, Google, https://support.google.com/googleplay/android-developer/answer/6048248 (last accessed Apr. 29, 2025).

collects AAIDs from two separate mobile applications, it can track, cross-correlate, and aggregate a user's activity on both apps.

62. Although technically resettable, an AAID is a persistent identifier because an average user does not know about AAIDs and, correspondingly, virtually no one resets that identifier. The fact that the use and disclosure of AAIDs is so ubiquitous evinces an understanding on the part of Defendant, Google, and others in the data and technology field that AAIDs are almost never manually reset by users (or else an AAID would be of no use to advertisers). *See also Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022) ("While AAID are resettable by users, the plaintiff plausibly alleges that AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets their AAID.") (cleaned up).

63. Using publicly available resources, an AAID can track a user's movements, habits, and activity on mobile applications.[34] Put together, the AAID serves as "the passport for aggregating all of the data about a user in one place."[35]

64. Because an AAID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading and viewing preferences. These inferences, combined with publicly available tools, make AAIDs an identifier that sufficiently permits an ordinary person to identify a specific individual.

[34] Thomas Tamblyn, *You Can Effectively Track Anyone, Anywhere Just By The Adverts They Receive*, HUFFPOST, Oct. 19, 2017, 12:07 PM), https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5.

[35] Willie Boag, *Trend Report: Apps Oversharing Your Advertising ID*, IDAC, https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/ (last accessed Dec. 2, 2024).

65. By disclosing users' AAIDs to third parties, Defendant discloses information that an ordinary person could use to identify its users.

*3. Defendant Discloses Information Identifying What Specific Videos Were Requested, or Obtained By What Specific App Users to Amplitude and WebEngage*

66. Defendant also discloses the course title and course ID of each course requested and viewed by each Android user to Amplitude and WebEngage.

67. For example, the dynamic analysis was conducted while a course called "Introduction to Image Generation" was viewed on the App. As demonstrated below, this is a course provided by Simplilearn and the title and ID for the course were disclosed to Amplitude:


```
"product id": "3810",
"product name": "Introduction to Image Generation",
```


68. And WebEngage:


```
"product id": "3810",
"product name": "Introduction to Image Generation",
"product type": "course",
"sl_freemium_user": "true"
},
"event_name": "Start Course Enrollment",
```


69. In addition, Defendant also discloses to WebEngage the specific lesson video and lesson IDs that an Android user views. For example, the dynamic analysis was conducted while a video called "Conditional Statements in Python" was viewed on the App. As demonstrated below, this is a lesson as part of the "Python for Beginners" course provided by Simplilearn, and the title and the course's title ("Python for Beginners"), course's ID ("1723"), lesson video title ("Conditional Statements in Python"), and lesson video ID ("67506") for the video watched were disclosed to WebEngage:

```
        "elearning id": "4214",
        "lesson id": "67506",
        "lesson name": "Conditional Statements in Python",
        "lesson number": "Lesson 5",
        "product id": "1723",
        "product name": "Python for Beginners",
        "product type": "course",
        "topic id": "676419",
        "topic name": "5.1 Conditional Statements in Python",
        "video progress percentage": "0"
        [...]
},
"event_name": "Viewed Lesson Video",
[...]
```


70. This network traffic is transmitted when, and only when, the user actually views the course module.

71. Because each on-demand course on the App is the same for each user and contains exactly the same pre-recorded videos, disclosure of the course title also discloses precisely what videos were requested and obtained by a particular user.

72. Further, completion of a certificate in a particular course discloses what videos were viewed, as a user need to complete the entire course (all the videos within each distinct course) to obtain a certificate.

73. In summary, Defendant discloses information to third parties, like Amplitude and WebEngage, that would make it reasonably and foreseeably likely that Amplitude and WebEngage could identify what specific user requested or obtained what specific video. Indeed, the information Defendant discloses is so identifying that even an ordinary person could identify what specific user requested or obtained what specific video. Accordingly, Defendant discloses personally identifiable information to third parties.

## IV. DEFENDANT DISCLOSES PERSONALLY IDENTIFIABLE INFORMATION TO THIRD PARTIES FOR THE PURPOSE OF MARKETING, ADVERTISING. AND ANALYTICS

74. Defendant discloses personally identifiable information and confidential communications to Amplitude and WebEngage so they can help Defendant with marketing, advertising, and analytics.

75. As alleged above, the Amplitude API and WebEngage API are designed to analyze App data and marketing campaigns, conduct targeted advertising, and ultimately boost Defendant's revenue from their video-based marketing and advertising on the App. *See, e.g.*, *Saunders v. Hearst Television, Inc.*, 711 F.Supp.3d 24, 33 (D. Mass. 2024) (disclosures to Braze and Google for "marketing, advertising, and analytics – do not fall within the [ordinary course of business] exception[]") (cleaned up); *Rancourt v. Meredith Corp.*, 2024 WL 381344, at *17 (D. Mass. Feb. 1, 2024) (same as to disclosures to Twilio for "targeted advertising … which is intended to drive revenue").

### A. Defendant Discloses Personally Identifiable Information To Amplitude For The Purpose Of Marketing, Advertising, And Analytics

76. Amplitude describes itself as "a digital analytics platform" that purports to "help every business optimize the business value of digital product innovation."[36]

77. Amplitude helps app developers like Defendant market, advertise, and analyze app data and analyze real-time user data in order to build precise audiences of "behavioral data," which "reveals how engagement with [a] product affects retention, conversion, revenue, and other business outcomes [its customers] care about."[37]

78. The data Amplitude collects is not just from one source. On the contrary, app developers can integrate customer data from a variety of sources into Amplitude. Using this data, app developers can then utilize Amplitude's analytics to create "cohorts" of customers with certain characteristics to "deliver insights into the frequency and duration of [a company's] users'

---

[36] Amplitude, https://amplitude.com/company (last accessed Dec. 2, 2024).

[37] *Identify users with similar behaviors*, Amplitude (Sept. 3, 2024), https://amplitude.com/docs/analytics/behavioral-cohorts.

engagement with [a company's] product" [38] and to export this data to other platforms for marketing.

79. Amplitude conglomerates all of this data into user profiles, which it associates with identifiers like an Amplitude user ID and/or e-mail address.[39]

80. As Amplitude collects more data, however, the user profiles become even more detailed. These detailed user profiles include "demographic[,] behavioral [and] algorithmic data," like the information collected from Plaintiff, to "maximize conversion rates" of targeted advertising.[40]

81. Defendant uses each and every one of the above-mentioned features of the Amplitude API in Defendant's integration of the Amplitude API into Defendant's App. Thus, Defendant utilizes the Amplitude API to analyze user data, create and analyze the performance of marketing campaigns, and target specific users or specific groups of users for advertisements. All of this helps Defendant further monetize the App and maximize revenue by collecting and disclosing as much PII as possible to Amplitude through the Amplitude API.

### B. Defendant Discloses Personally Identifiable Information to WebEngage for the Purpose of Marketing, Advertising, and Analytics

82. As alleged above, the WebEngage API is "[a] robust customer data platform, personalization engine, omnichannel campaign manager, and an analytics engine."[41] By

[38] *Understand your users' activity*, Amplitude (Aug. 28, 2024), https://amplitude.com/docs/get-started/understand-user-activity.

[39] *Identify users with similar behaviors*, Amplitude (Sept. 3, 2024), https://amplitude.com/docs/analytics/behavioral-cohorts.

[40] *Amplitude Audiences Overview*, Amplitude (Oct. 18, 2024), https://amplitude.com/docs/data/audiences.

[41] https://www.appengine.ai/company/webengage (last accessed Apr. 30, 2025).

collecting user data, WebEngage promotes that companies will be able to "Bring Data and Analytics to the Fore-front and Skyrocket Your Revenue Growth."[42]

83. WebEngage's data collection initially begins anonymously through an "LUID," and all actions associated with this LUID are detailed under an "Unknown User Profile."[43] However, once a user performs an action "that enables you to identify them," such as logging into an account, the user will be assigned a CUID.[44] And all user actions associated with this CUID will then be detailed under a "Known User" profile, which allows for the identification of that user[45] The picture below is taken from WebEngage's own description of its technology:




[42] *Id.*

[43] *Users*, WebEngage, https://docs.webengage.com/docs/users#luid (last accessed Dec. 2, 2024).

[44] *Id.*

[45] *Id.*

84. Once a user has been identified by WebEngage—as any user of the App who creates an account would be—Defendant can then analyze that user's deanonymized App activity and target the user with specific marketing and advertising.

85. As to analytics, WebEngage touts that it provides "real-time analytics for accelerated growth," noting that its API helps app developers "uncover" "everything about your users."[46]

86. Specifically, WebEngage allows companies like Defendant to get "[m]inute-by-minute" "[i]nsights into users who are currently active on [their] app and website,"[47] such as analyzing the actions users took on an app or website and comparing user trends over time[48] or "understand[ing] what actions [their] users take before they uninstall [their] mobile app" so as to prevent uninstalls.[49]

87. By collecting these app analytics, companies like Defendant can (and do) utilize this data to improve their marketing and advertising efforts, another feature WebEngage assists with. For instance, by utilizing WebEngage's live analytics, WebEngage allows companies to conduct targeted marketing in real-time based on real-time user information and behavioral data.[50]

---

[46] *Real-Time Analytics*, WebEngage, https://webengage.com/product-and-revenue-analytics/ (last accessed Dec. 2, 2024).

[47] *Track Live Stats for Your App, Website & Campaigns*, WebEngage, https://webengage.com/product-and-revenue-analytics/live-analytics/ (last accessed Dec. 2, 2024).

[48] *Unlock Hidden Insights with Paths*, WebEngage, https://webengage.com/product-and-revenue-analytics/paths/ (last accessed Dec. 2, 2024).

[49] *People Uninstall for a Reason. We'll Help You Retain Them*, WebEngage, https://webengage.com/product-and-revenue-analytics/uninstalls/ (last accessed Dec. 2, 2024).

[50] *Real-Time Segmentation*, WebEngage, https://webengage.com/customer-segmentation/ (last accessed Dec. 2, 2024).

Indeed, WebEngage goes as far as to say companies who use its API can "[i]nfluence ongoing user behaviour with real-time segmentation."[51]

88. WebEngage also allows companies to "[e]nrich campaigns with key profile information like Name, Gender, Birthdate, Education, etc.," among other types of user data.[52]




51 *Influence Ongoing user Behaviour with Real-time* Segmentation, WebEngage, https://webengage.com/customer-segmentation/live/ (last accessed Dec. 2, 2024).

52 *Id.*; *see also Real-Time Segmentation*, WebEngage, https://webengage.com/customer-segmentation/ (last accessed Dec. 2, 2024) (noting companies that use the WebEngage API can "[u]se customer attributes, behavioral data, and other derived insights to create static customer segments").

89. Similarly, WebEngage allows companies like Simplilearn to "[u]se real-time customer data … to create hyper-personalized in-app notifications" for advertising purposes[53]:




*WebEngage promotional graphic used for the proposition that companies who use the WebEngage API can "[u]se real-time customer data from your systems to create hyper-personalized in-app notifications."*

90. Once all of this data is collected by WebEngage, the WebEngage API allows companies like Defendant to use the data to create "user profiles to understand everything from demographic data, behavior, attributes, reachability, etc. to run targeted campaigns for the right set of users" and give companies like Defendant "[t]he most comprehensive view of all your user data and events"[54]:

[53] *Capture Attention Instantly and Compel Actions Within Your App*, https://webengage.com/app-personalization/in-app-notifications/ (last accessed Dec. 2, 2024); *see also Tracking Users*, WebEngage, https://docs.webengage.com/docs/android-tracking-users (last accessed Dec. 2, 2024).

[54] *Omnichannel Marketing Automation Tool For Data-Driven Marketing Teams*, WebEngage, https://webengage.com/marketing-automation/ (last accessed Dec. 2, 2024).




91. WebEngage summarizes the above allegations and the extent of its capabilities in a video entitled "Hyper Personalization in Campaigns With WebEngage: Our How-To Video."[55] The video illustrates the ease with which companies like Defendant can set up "deep data personalization in [] engagement campaigns" by disclosing PII to WebEngage.[56]

92. The video touts that WebEngage brings companies the "best in class suite" that allows companies like Defendant to "personalize [] campaigns in ways you've always

[55] *Hyper Personalization In Campaigns With WebEngage: Our How-To Video*, YouTube, https://www.youtube.com/watch?v=IoQgFjj0S5k (last accessed Dec. 2, 2024).

[56] *Id*.

imagined."[57] For instance, by sending deanonymized consumer data to WebEngage, companies like Defendant can send personalized push notifications to users who perform a certain action on a mobile application, such as adding an item to a shopping cart or, in Defendant's case, watching a certain video.

93. Notably, companies like Defendant can select from a "plethora of variables" (*i.e.*, data) provided to WebEngage when personalizing these campaigns, including the PII Defendant provides to WebEngage here.[58]

94. WebEngage's video presentation goes on to note that "as long as we're tracking the relevant user related data—their profile attributes, events, and event attributes—all of that data is at your fingertips in the personalization menu when creating campaigns."[59]

95. As the video presentation explains, WebEngage stores, at a minimum, "user profile data, event data, and [user] attributes."[60]

96. On top of this, the video presentation makes clear that WebEngage can collect and aggregate data from other third party APIs used by companies in order to better assist with analytics, advertising, and marketing, such as by "using [third party data] in campaigns inside a [user] journey."[61]

97. Defendant uses each and every one of the above-mentioned features of the WebEngage API in its integration of the WebEngage API into the App. Thus, Defendant utilizes the WebEngage API to analyze user data, launch marketing campaigns, and target specific users

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

or specific groups of users for advertisements. All of this, especially in conjunction with WebEngage's marketing and advertising services, helps Defendant further monetize the App and maximize revenue by collecting and disclosing as much PII as possible to WebEngage via the WebEngage API.

## V. PLAINTIFF'S EXPERIENCE

98. In or around June 2023, Plaintiff Korn downloaded the Simplilearn App on his iPhone and created a Simplilearn account.

99. Plaintiff used the App and viewed videos on the App in Massachusetts during June 2023.

100. At all times relevant, Plaintiff never consented, agreed, nor otherwise permitted the App to disclose his PII to third parties.

101. Likewise, Defendant never gave Plaintiff the opportunity to prevent the App from disclosing his PII to third parties.

102. Nevertheless, each time Plaintiff viewed a video on the App, Defendant disclosed his PII to Amplitude via the Amplitude API. Specifically, Defendant disclosed to Amplitude via the Amplitude API Plaintiff's (i) email address, (ii) geolocation, (iii) course title, (iv) course ID, and (v) IDFV. Using this information, Amplitude was able to identify Plaintiff and attribute his video viewing records to an individualized profile of Plaintiff in its databases. Indeed, even an ordinary person could identify Plaintiff using the data Defendant disclosed to Amplitude. Plaintiff's PII was also used to create a user profile that included his activity on the App, which Defendant uses for marketing, advertising, and analytics purposes.

103. Each time Plaintiff viewed a video on the App, Defendant also disclosed his PII to WebEngage via the WebEngage API. Specifically, Defendant disclosed to WebEngage via the WebEngage API Plaintiff's (i) email address, (ii) geolocation, (iii) course title, (iv) course ID, (v)

IDFV and (vi) zip code. Using this information, WebEngage was able to identify Plaintiff and attribute his video viewing records to an individualized profile of Plaintiff in its databases. Indeed, even an ordinary person could identify Plaintiff using the data Defendant disclosed to WebEngage. Plaintiff's PII was also used to create a user profile that included his activity on the App, which Defendant uses for marketing, advertising, and analytics purposes.

## CLASS ALLEGATIONS

104. **Class Definition:** Plaintiff seeks to represent a class of similarly situated individuals defined as all persons in the United States who viewed a pre-recorded video on the App and had their PII transmitted to a third party (the "Class").

105. Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

106. **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiff does not know the exact number of members of the aforementioned Class. However, given the popularity of the App, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

107. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

(a) whether Defendant collected Plaintiff's and the Class' PII;

(b) whether Defendant unlawfully disclosed and continues to disclose its users' PII, including their video viewing records, in violation of the VPPA;

(c) whether Defendant's disclosures were committed knowingly; and

(d) whether Defendant disclosed Plaintiff's and the Class' PII without consent.

108. **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, requested, obtained, and watched videos on the App and had his PII collected and disclosed by Defendant to third parties.

109. **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiff has retained and is represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring. Plaintiff and his counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class. Neither Plaintiff nor his counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Class. Plaintiff has raised viable statutory claims, or the type reasonably expected to be raised by members of the Class and will vigorously pursue those claims. If necessary, Plaintiff may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

110. **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Even if every member of the Class could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from

multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Class. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### Violation Of The VPPA,
### 18 U.S.C. § 2710

111. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

112. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

113. Defendant is a "video tape service provider[s]" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as it provides videos (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via the App.

114. Plaintiff and members of the Class are "consumers" as defined by the VPPA because they downloaded, installed, and watched videos using the App. 18 U.S.C. § 2710(a)(1). Under the VPPA, therefore, Plaintiff and members of the Class are "subscribers" of "goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1); *see also Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 487-89 (1st Cir. 2016).

115. Plaintiff and members of the Class requested, obtained, and viewed videos using the App. During these occasions, the App disclosed Plaintiff's and members of the Class' PII. Specifically:

- Plaintiff's and Class Members': (i) email addresses, (ii) geolocations, (iii) course titles, (iv) course IDs, (v) AAIDs and (vi) IDFVs were disclosed to Amplitude via the Amplitude API.
- Plaintiff's and Class Members': (i) email addresses, (ii) geolocations, (iii) course titles, (iv) course IDs, (v) AAIDs, (vi) IDFVs, and (vii) zip codes were disclosed to WebEngage via the WebEngage API.

116. The App's transmissions of Plaintiff's and Class members' PII to Amplitude and WebEngage via the Amplitude API and WebEngage API constitute "knowing[] disclosures" of Plaintiff's and members of the Classes' "personally identifiable information" to a person as proscribed by the VPPA. 18 U.S.C. § 2710(a)(1).

117. Under the VPPA, the term "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The information disclosed by the App constitutes "personally identifiable information" because it allows even an ordinary person to identify Plaintiff and members of the Class, as well as what specific videos were requested, obtained, and watched by Plaintiff and the Class. The disclosures also make it "reasonably and foreseeably likely to reveal" what specific App videos were obtained by each Plaintiff and each member of the Class.

118. Plaintiff and members of the Class did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

119. Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, the App's disclosures to Amplitude and WebEngage were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

120. On behalf of himself and the Class, Plaintiff seeks: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests, individually and on behalf of the alleged Class, that the Court enter judgment in his favor and against Defendant as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as the representative of the Class, and naming Plaintiff's attorneys as Class Counsel;

(b) For an order declaring that Defendant's conduct violates the causes of action referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e) For prejudgment interest on all amounts awarded;

(f) For an order of restitution and all other forms of equitable monetary relief;

(g) For injunctive relief as pleaded or as the Court may deem proper; and;

(h) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: May 5, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: /s/ *Yitzchak Kopel*
Yitzchak Kopel

Yitzchak Kopel (BBO #716245)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7127
Facsimile: (212) 989-9163
Email: ykopel@bursor.com

*Attorney for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that the foregoing was filed through the Electronic Court Filing system on May 5, 2025, and a copy thereof will be sent electronically to the registered recipients as identified on the Notice of Electronic Filing.

By: */s/ Yitzchak Kopel*
Yitzchak Kopel